1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JUAN CARLOS MEDINA,                      No.  2:16-cv-02859-DB

12                    Petitioner,

13         v.                                  ORDER AND FINDINGS &
                                               RECOMMENDATIONS
14    RON DAVIS,

15                    Respondent.

16

17           Petitioner is a state prisoner proceeding through counsel with a petition for a writ of

18    habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 2013 conviction imposed by the

19    Butte County Superior Court for second degree murder.  This matter proceeds on petitioner's four

20    claims for violations of his due process rights and ineffective assistance of counsel.  (ECF No. 1.)

21    Respondent filed an answer (ECF No. 13), and petitioner filed a traverse (ECF No. 18).

22                               **BACKGROUND**

23    **I.     Facts Established at Trial**

24           The California Court of Appeal for the Third Appellate District provided the following

25    summary of the relevant evidence presented at trial:[1]

26                In June 2006, about two weeks before the killing, defendant began a
                  vehicle chase, chasing driver Kristin Garcia and her boyfriend and
27

─────────────────────────
[1] The undersigned has independently reviewed the trial record and confirms the accuracy of the state court's
28    recitation of the evidence presented at trial, including the excerpts that are cited herein.

                                          1

passenger Trenton Grey Stopplemore ("Trent," or the victim), who told Garcia he was terrified of defendant.  Eventually, they stopped at a fire station, defendant and Trent got out and had a discussion, then defendant displayed a screwdriver and followed Trent out of Garcia's view.

On June 22, 2006, Trent called Garcia around 10:30 p.m., and told her he was picking up defendant and a man known as "Speedy" at a labor camp; then Trent made a three-way call in which Garcia heard Trent say he was going to get Speedy at the camp.  At 10:44 p.m., a 911 call reported a stabbing.

That night Trent knocked on the door of a house near the camp, was bleeding, and said he felt like he was dying.  He said he had been stabbed by "Mexicans" at the camp.  He had been at least stabbed three times, once in the neck and twice in the back.  He subsequently bled to death.  A blood trail led 1,200 feet towards the camp parking lot.

Defendant lived about 200-300 yards from the camp parking lot.  Six weeks after the killing his house was searched; officers found a paper with four names, including "Trent" after which was written "$100."  The other names also had numbers after them.  An experienced narcotics officer opined this paper was a narcotics "pay-owe" sheet.

About two to four weeks after the killing, Kellie Weil, Trent's former girlfriend, accused defendant of killing Trent.  Defendant responded, "Yeah, I did it" mockingly, but proudly.  On a later occasion, when Weil was again accusing him, defendant pulled a knife, which Weil interpreted as a threat.  Weil had told an officer that defendant put a knife in her face while in a car.  At another location, defendant saw Weil and drew his hand across his neck, but Weil never told the police about this.

Frank Brewer testified that between May and September 2007, he was with defendant and other people at a drug house in Gridley when he heard a man named Garfield tell some third person that "[y]ou better have [defendant's] money; you saw what happened to Trent."  Defendant immediately laughed.

The defense theory was that defendant was visiting his prematurely born child in a San Francisco hospital.  The child had an emergency appointment on June 22, 2006 (the day of the killing), and had been readmitted three days later.  Defendant would visit his child after work and spent a lot of time at the hospital during this period.  This alibi was supported by testimony from the child's mother (Krista Gramps) and by defendant's mother (Clara Medina).  This alibi was partly undermined by evidence of a 2011 recorded telephone conversation in which Gramps complained to defendant that he had *not* been with the family on June 22, 2006.  At trial, Gramps claimed she had been mistaken about the date, and had been referencing defendant's absence from the hospital in April 2006.

Hospital records contain a notation dated June 25, 2006, stating: "The father of the baby is not involved."

1

2      The prosecutor argued that defendant personally fatally stabbed the
       victim.  The prosecutor argued the forensic evidence showed intent,
3      because:  "The fact that Mr. Medina used a knife to sink it through
       the victim's neck speaks volumes about what his goal is, what his
4      intentions are, what his objectives are."  The prosecutor consistently
       portrayed defendant as the actual killer.  The defense argument was
5      that defendant "had nothing to do with" the murder, pointing out no
       physical evidence (DNA, footprints, fingerprints, knife, etc.) tied him
6      to it.   The defense argued that the People's case rested on the
       testimony of Weil and Brewer, who were unreliable, inconsistent,
7      and "under the influence" when they purported to see the things they
       testified about.  The defense rested on alibi, that defendant "was
8      somewhere else when the crime was committed."   The defense
       argued the victim's dying declaration was exculpatory, because the
9      victim said "Mexicans" did this to him, but did not name defendant,
       whom he knew.  In rebuttal, the prosecutor argued the victim may
10     never have known who stabbed him, because he was stabbed from
       behind.

11     The jury acquitted defendant of first degree murder, convicted him
       of second degree murder, and found the knife-use enhancement not
12     true.

13   Lodged Doc. 21 at 2–4.

14          Following the jury's verdict, petitioner's counsel filed a petition for disclosing personal

15   juror information.  In support of the petition, petitioner's counsel argued that the prosecution did

16   not request any of the aiding and abetting jury instructions but during closing argued the ambush

17   theory, which would indicate that "if [petitioner] was not a stabber or the perpetrator, then he was

18   somehow involved in that."  Based on this and a discussion with at least one juror, counsel argued

19   that "the jurors were not properly instructed on aiding and abetting instructions."  In opposition,

20   the prosecutor addressed the argument that because no knife enhancement was found there could

21   not have been a murder, arguing that "the jury reached a logical conclusion that the people had

22   not proven that a knife was used to inflict these wounds, but given the admissions by Mr. Medina

23   and the surrounding evidence, it's very clear to the jurors that Mr. Medina was the one who

24   inflicted these injuries on Mr. Stopplemore and took Mr. Stopplemore's life."  In reply,

25   petitioner's counsel argued that the prosecutor raised an aiding and abetting theory and those

26   instructions should have been given.  He further argued that "by returning the not true verdict that

27   Mr. Medina had personally used a deadly and dangerous weapon, the knife that was used to kill

28   Mr. Stopplemore, by returning that, the jury, one, did not believe Ms. [Weil] and [Mr.] Brewer,

3

1    and found that Mr. Medina was not the stabber or the perpetrator," which in turn would mean that

2    "he could only be found guilty of murder if the jury found that he was an aider and abettor to the

3    perpetrator."  In response, the prosecutor argued that "at no point did the people argue aiding and

4    abetting.  We were very clear that the basis of the evidence against Mr. Medina really is the

5    admissions and adopted admissions that he had stabbed the victim."  Petitioner's counsel

6    responded that, according to him, "the reason why we developed this is talking to one of the

7    jurors, the juror specifically told [counsel's investigator] that the jury did not believe that Mr.

8    Medina stabbed Mr. Stopplemore, but that he somehow had something to do with it and it had to

9    do at least in this juror's mind, [the prosecutor's] ambush theory that argued to the jury."

10   Ultimately, the court made an express finding that petitioner did not make a prima facie showing

11   of good cause for disclosure and declined to set a hearing on the matter.  RT at 2849–66.[2]

12       Petitioner later filed a motion for a new trial, arguing that instructions on aiding and

13   abetting should have been given to the jury and petitioner cannot have been the perpetrator if he

14   did not stab the victim.  This is based on the fact that the jury found petitioner guilty of second

15   degree murder and, according to petitioner's counsel, the jury found that petitioner was not the

16   actual person who stabbed the victim.  Petitioner's counsel believed it clear that "the only way

17   that the jury could find Mr. Medina liable is by finding that he was an aider and abettor."

18   Counsel reiterated the defense theory that because the victim said the "Mexicans" did this, and

19   did not identify petitioner by name, petitioner could not have been the perpetrator.  The

20   prosecutor responded, again reiterating that "[a]t not point was there a suggestion that anyone

21   other than Mr. Medina was responsible for this stabbing."  The motion for new trial was denied.

22   RT at 2886–96.

23       **II.      Relevant Procedural Background**

24       Petitioner timely appealed claims one and two, and the California Court of Appeal

25   affirmed the judgement of conviction on April 27, 2016.  Lodged Doc. 21.  The California

26   Supreme Court denied review without comment on July 18, 2016.  Lodged Doc. 23.

27   ////

28   _____

[2] "RT" refers to the Reporter's Transcript on Appeal.

4

1    Regarding claims three and four, on August 29, 2016, petitioner filed a petition for writ of

2    habeas corpus with the Superior Court of California, County of Butte.  Lodged Doc. 24.  On

3    October 26, 2016, petitioner filed a petition for writ of habeas corpus with the California Court of

4    Appeal.  Lodged Doc. 26.  The California Court of Appeal denied the petition without comment

5    on November 3, 2016.  Lodged Doc. 27.  Petitioner's writ was filed with the Supreme Court of

6    California on November 18, 2016.  Lodged Doc. 28.  The Supreme Court of California denied the

7    petition without comment on January 11, 2017.  Lodged Doc. 29.

8    By operation of the prison mailbox rule, the instant federal petition was filed November

9    30, 2016.[3]  ECF No. 1.  Respondent answered on October 24, 2017.  ECF No. 13.  Petitioner filed

10   a traverse on December 14, 2017.  ECF No. 18.

11   **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

12   An application for a writ of habeas corpus by a person in custody under a judgment of a

13   state court can be granted only for violations of the Constitution or laws of the United States.  28

14   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

15   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

16   U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

17   Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

18   corpus relief:

19   An application for a writ of habeas corpus on behalf of a person in
20   custody pursuant to the judgment of a State court shall not be granted
     with respect to any claim that was adjudicated on the merits in State court
21   proceedings unless the adjudication of the claim –

22   (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
23   determined by the Supreme Court of the United States; or

24   (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
25   State court proceeding.

26   For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

27   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

28   _____
[3]  See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is deemed filed on
the date the prisoner delivered the document to prison officials for mailing).

1    Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

2    (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)).  Circuit court precedent "'may be

3    persuasive in determining what law is clearly established and whether a state court applied that

4    law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th

5    Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle

6    of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

7    announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S.

8    37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely

9    accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

10    accepted as correct."  Id. at 1451.  Further, where courts of appeals have diverged in their

11    treatment of an issue, it cannot be said that there is "clearly established Federal law" governing

12    that issue.  Carey v. Musladin, 549 U.S. 70, 76–77 (2006).

13        A state court decision is "contrary to" clearly established federal law if it applies a rule

14    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

15    precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003)

16    (quoting Williams, 529 U.S. at 405–06).  "Under the 'unreasonable application' clause of

17    § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

18    governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

19    principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

20    (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

21    federal habeas court may not issue the writ simply because that court concludes in its independent

22    judgment that the relevant state-court decision applied clearly established federal law erroneously

23    or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

24    see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not

25    enough that a federal habeas court, in its independent review of the legal question, is left with a

26    firm conviction that the state court was erroneous." (Internal citations and quotation marks

27    omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

28    so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

1   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

2   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

3   state prisoner must show that the state court's ruling on the claim being presented in federal court

4   was so lacking in justification that there was an error well understood and comprehended in

5   existing law beyond any possibility for fair minded disagreement." Richter, 562 U.S. at 103.

6          There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

7   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

8   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

9   process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox,

10   366 F.3d 992, 999–1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790–91 (9th Cir.

11   2014) (If a state court makes factual findings without an opportunity for the petitioner to present

12   evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

13   to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

14   applying the normal standards of appellate review," could reasonably conclude that the finding is

15   supported by the record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

16          The second test, whether the state court's fact-finding process is insufficient, requires the

17   federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

18   finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

19   process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d

20   943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

21   automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court may

22   make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

23   or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459

24   F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

25          If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews

26   the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see

27   also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we

28   may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error,

1  we must decide the habeas petition by considering de novo the constitutional issues raised.").  For

2  the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of

3  28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the]

4  claim in State court proceedings" and by meeting the federal case law standards for the

5  presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170,

6  186 (2011).

7       The court looks to the last reasoned state court decision as the basis for the state court

8  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

9  "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

10  a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

11  reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

12  banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

13  has been presented to a state court and the state court has denied relief, it may be presumed that

14  the state court adjudicated the claim on the merits in the absence of any indication or state-law

15  procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

16  overcome by showing "there is reason to think some other explanation for the state court's

17  decision is more likely."  Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

18  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

19  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

20  the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293 (2013).

21  When it is clear, that a state court has not reached the merits of a petitioner's claim, the

22  deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

23  must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

24  1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

25  ////

26  ////

27  ////

28  ////

**ANALYSIS**

I.      **Claim 1: Petitioner's Due Process Rights Were Violated Because the Trial Court Admitted an Adoptive Admission**

Petitioner attached his Court of Appeal opening brief in support of his first claim. Therein, petitioner argued that admission of the adoptive admission Brewer witnessed was an error "because [petitioner's] laugh was ambiguous and did not constitute an adoption of the statement as true, appellant was not mentioned in conversation when it was reported to police, and there was no accusation that appellant could admit to." (ECF No. 1 at 29.)  Petitioner claims he was "prejudiced because the jury hung in the first trial where this adoptive admission was not admitted.  Therefore, it is reasonable to conclude that the adoptive admission was critical to the murder conviction in the second trial."  (Id. at 29, 38–40.)

**A.  Decision of the State Court**

In the only reasoned state court decision, the California Court of Appeal considered this issue and held as follows:

> Defendant contends the trial court erred under state and federal law by admitting Brewer's testimony that defendant laughed when someone suggested he had killed the victim over a debt.  We find the trial court acted within its discretion in submitting to the jury the question whether defendant made an adoptive admission.
>
> A.  *Brewer's Testimony at the Hearing and Trial*
>
> The People moved to admit the alleged adoptive admission by defendant, and the trial court held a hearing outside the presence of the jury. (See Evid. Code, § 402.) [RT at 2261–95.] Brewer testified that in November 2009, he spoke with Detective Martin and told him that Garfield "was saying he better have [defendant's] money . . . [or] you seen what happened to Trent."  Defendant was there, and "just laughed."  This discussion took place in the summer of 2007.  It was outside a house, inside the garage with the door open. Brewer was intoxicated on methamphetamines at the time he observed this incident.  The trial court allowed the evidence to go to the jury.
>
> At trial, Brewer testified that he began using methamphetamine at about 15 years old and was using it in 2007.  He had several convictions or juvenile adjudications involving violence and moral turpitude.  In the summer of 2007, at a "known dope house" in the Gridley area, he, defendant and Garfield were present, plus other people Brewer could not remember.  Brewer was under the influence of methamphetamine at that time.  At one point "Garfield said: You

9

better have [defendant's] money; you seen what happened to Trent. [¶] [Defendant] just laughed." Brewer did not immediately report this exchange because he was a gang member and could be hurt or killed for talking to the police. In November 2009, he was in custody, facing serious charges, and disclosed the exchange both because of his lingering belief in the wrongfulness of the crime and also in the hope it would help his case. However, he never received anything for his disclosure, although he conceded that as part of a plea bargain one charge was reduced to a misdemeanor for reasons unrelated to his testimony in defendant's case.[4] Brewer told a defense investigator he lied about the statement in the hope that he would not have to testify, but he testified he only said that because he feared retaliation.

B. *Analysis*

A trial court has broad discretion to make evidentiary rulings, which we review for an abuse of discretion. (See *People v. Benavides* (2005) 35 Cal.4th 69, 90.) In exercising its discretion, the trial court was required to consider the law applicable to the issue at hand. (See *County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778.)

Evidence code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." Prior cases interpreting this evidentiary rule have held that a jury or trial court could find a defendant adopted an inculpatory statement against him by laughing in response thereto (*People v. Browning* (1975) 45 Cal.App.3d 125, 143-14, overruled on other grounds by *People v. Williams* (1976) 16 Cal.3d 663, 669) or even by smiling at an accusation (*People v. Silva* (1988) 45 Cal.3d 604, 623-625).

Based on these precedents, the trial court acted within its discretion by admitting the evidence and instructing the jury that it *may* find, if it believed Brewer, that defendant's laughter was an admission.[5]

The fact the accusation was not explicit goes to the weight of the evidence. And although, as counsel asserts, defendant's laugh may have been no more than a reflection of his belief that the accusation

---

[4] [Footnote 4 in original] The transcript of a recording of Brewer's interview with Detective Martin is broadly consistent with Brewer's trial testimony about defendant's statement. [See CT at 1037–39.]

[5] [Footnote 5 in original] Over defendant's objection based on lack of sufficient evidentiary support, the trial court read the jury the pattern instruction on adoptive admissions, as follows: "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] One, the statement was made to the defendant or made in his presence; [¶] Two, the defendant heard and understood the statement; [¶] Three, the defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; [¶] And four, the defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.)

1

was absurd, that was a matter for the jury to resolve, under the evidence and the instruction.

2

3

Accordingly, we find no state-law evidentiary error in this case. Further, "when evidence is properly admitted under the Evidence Code, there is no violation of due process." (*People v. Johnson* (2015) 61 Cal.4th 734, 763 [dying declaration case].)[6]

4

5

Lodged Doc. 21 at 4–6.

6

**B.   Analysis**

7

**1.   Legal Standard**

8

The admission of evidence is generally a matter of state law, and habeas relief does not lie

9

for errors of state law.  Estelle, 502 U.S. at 67.  Moreover, "[t]he Supreme Court has made very

10

few rulings regarding the admission of evidence as a violation of due process."  Holley v.

11

Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  In fact, the Supreme Court "has not yet made

12

a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process

13

violation sufficient to warrant issuance of the writ."  Id.

14

The due process inquiry in federal habeas review is whether the admission of evidence

15

was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Walters v. Maass,

16

45 F.3d 1355, 1357 (9th Cir. 1995).  Admission of evidence violates due process only if "there

17

are *no* permissible inferences the jury may draw from the evidence.  Even then, the evidence must

18

'be of such quality as necessarily prevents a fair trial.'"  Jammal v. Van de Kamp, 926 F.2d 918,

19

920 (9th Cir. 1991) (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)

20

(videotape of victim's autopsy, although unpleasant, not inflammatory and thus did not inject

21

element of unfairness)); see also Estelle, 502 U.S. at 68–70 (rejecting due process challenge to

22

admission of prior bad act evidence because it "was relevant to an issue in the case"); Jeffries v.

23

Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Butcher v. Marquez, 758 F.2d 373, 378 (9th Cir.

24

_____

25

26

27

28

[6] [Footnote 6 in original]  We observe that the fact the jury was not compelled to draw any inference from this evidence was emphasized in argument.  The prosecutor read the adoptive admission instruction and described the testimony by Brewer.  He invited the jury to conclude this laugh was an admission of guilt.  The defense hit Brewer's credibility hard, based on the fact he was [a] long-time drug user, high on methamphetamine at the time he claimed to have heard this exchange, and the fact that he waited over two years, after he was arrested on other charges, to tell his story.  Further, Brewer admitted he had previously lied to the police about an earlier matter, and had several felony convictions evidencing untruthfulness.  Thus, the jury had ample opportunity to evaluate whether Brewer was telling the truth, correctly perceived and recalled what happened, and whether defendant's laugh was, in fact, an admission.

11

1    1985).  The Supreme Court has rejected the argument that due process necessarily requires the

2    exclusion of prejudicial evidence.  <u>Spencer v. Texas</u>, 385 U.S. 554, 563–64 (1967); <u>see also</u>

3    <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990) (noting that "the category of infractions that

4    violate 'fundamental fairness'" is defined "very narrowly").

5

6               **2.  Was the State Court Opinion Contrary to or an Unreasonable Application of Clearly Established Federal Law?**

7        The Court of Appeal's denial of this claim was reasonable.  As noted above, "only if there

8    are *no* permissible inferences the jury may draw from the evidence can its admission violate due

9    process."  <u>Jammal</u>, 926 F.2d at 920.  Here, petitioner did not and cannot show that no permissible

10   inferences existed that the jury might draw from the adoptive admission evidence.  Indeed, as the

11   Court of Appeal correctly noted, there was clearly at least one permissible inference that the jury

12   could draw: that defendant's laughter was an admission that he committed the murder.  Lodged

13   Doc. 21 at 6.  In other words, the evidence was relevant to the murder charge against petitioner

14   because it aided the jury in assessing petitioner's guilt; and the jury could draw the inference that

15   because of his laughter immediately following Garfield telling a third person that "[y]ou better

16   have [defendant's] money; you saw what happened to Trent," petitioner admitted he murdered the

17   victim.  Because this inference was permissible, admission of the evidence does not meet the

18   standard of being so extremely unfair that it violated fundamental conceptions of justice.  The

19   state court's ruling was therefore not "so lacking in justification that there was an error well

20   understood and comprehended in existing law beyond any possibility for fair minded

21   disagreement."  <u>Richter</u>, 562 U.S. at 103.

22        Based on the foregoing, the court finds that the state court's denial of this claim was not

23   an unreasonable application of federal law within the meaning of AEDPA.  <u>See</u> <u>Moses v. Payne</u>,

24   555 F.3d 742, 751 (9th Cir. 2009).

25   **II.  Claim 2:  Petitioner's Due Process Rights Were Violated Because the Trial Court Failed to Instruct on Aiding and Abetting**

26

27        Petitioner next argues, vis-à-vis his appellate court opening brief, that the trial court had

28   "a sua sponte duty to instruct on the elements and theories supported by the evidence and the

12

court failed to instruct on aiding and abetting."  (ECF No. 1 at 41.)  According to petitioner, the "prosecution provided substantial evidence that [petitioner] aided and abetted the stabber, although it did not rely on that theory."  (Id.; see also id. at 41–49.)

**A.  Decision of the State Court**

In the only reasoned state court decision, the California Court of Appeal considered this issue and held as follows:

> Defendant contends the trial court erred by not instructing on aiding and abetting.  We find no error, because there was no evidence of aider liability.
>
> Defendant concedes neither party sought aiding instructions, but contends the issue is not forfeited and faults the prosecutor because "instruction on the aiding and abetting theory could only increase the chance of a guilty verdict."
>
> Absent substantial evidence to support an aiding theory, there was no basis to instruct thereon.  (See *People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1046, 1054-1055, 1058-1059.)  Here, as the People point out, defendant's claim of evidence that might support aider liability rests on his undeveloped assertion about the victim's dying declaration that "Mexicans" (plural) stabbed him.  Defendant argues that the victim knew defendant well and yet did not name him when asked by whom the victim was stabbed, concluding: "This dying declaration provides substantial evidence that appellant was only an aider and abettor."
>
> But as the People point out, there was no evidence defendant was present while someone else, or some others, inflicted the fatal stab wounds, nor was there any evidence that defendant was absent, yet somehow contributed to the killing.  Although defendant argues that the victim's use of the plural "Mexicans" "certainly indicates that more than one person was involved," this conclusion is far from certain.  The victim had been mortally wounded and apparently dragged himself to a nearby house.  Whether he could understand the question put to him and answer with the precision appellate counsel assumes is questionable.  Even if the victim thought more than one Mexican had killed him, this aider theory hinges on speculation that defendant acted solely as part of a group, disregarding trial evidence about the manner of the killing and the absence of a group.  Thus, there was no basis to instruct on aider liability.[7]

---

[7] [Footnote 7 in original]  In a posttrial motion, the defense suggested the People introduced an "ambush theory" which supported aider liability.  But the reference to ambush was to show premeditation: "Throughout human history, ambushes have been used as a form of violence against one another.  In order to effectively accomplish any ambush, the key to successfully executing any ambush is planning.  You have to think [ahead.]"  The prosecutor did not argue *multiple people* participated in such an ambush.  The defense theory was alibi; he presented no evidence or argument that he was present but either was not a participant or did not share the mental state of the perpetrator(s), or that he was an absent co-participant, although in his new trial motion he raised the possibility of non-present aider liability.  If an alternate aiding theory had been argued by trial counsel, it would have undermined the credibility of

13

1

2
  Defendant also argues that "[t]he jury verdict convicting appellate of second degree murder but finding the weapon use enhancement not true establishes that the [jury] found appellate guilty as an aider and

3
abettor."  We disagree.

4
  First, the not-true finding as to the enhancement does not speak to the jury's reasoning about murder.  The finding might have been no

5
more than the product of compromise or lenity.  (See § 954; *People v. Lewis* (2001) 25 Cal.4th 610, 655-656; *People v. Pahl* (1991) 226

6
Cal.App.3d 1651, 1656-1657; 6 Witkin & Epstein, Cal. Criminal law (4th ed. 2012) Criminal Judgment, § 85, pp. 128-129.)

7

8
  Second, as the prosecutor argued during post-trial motions, no knife was linked to the crime, and many objects can stab, therefore the jury

9
could rationally have concluded the People did not carry their burden to show that defendant used a *knife*, as alleged.  Indeed, the

10
prosecutor referenced evidence about defendant's prior use of a screwdriver--which had been after the vehicle chase a couple of

11
weeks before the killing--in argument.  The jury could rationally have had a doubt about what kind of implement defendant used to

12
kill Trent.

13
  There was no error in failing to instruct on aiding and abetting.

Lodged Doc. 21 at 7–9.

14
  **B.  Analysis**

15
   **1.  Legal Standard**

16
  Claims of error in state jury instructions are generally matters of state law, and thus may

17
not be considered on federal habeas review.  See <u>Gilmore v. Taylor</u>, 508 U.S. 333, 343–44

18
(1993).  Federal habeas relief is available only when a petitioner demonstrates that a trial court's

19
instructional error violated due process.  <u>Estelle</u>, 502 U.S. at 71–72; <u>see also</u> <u>Waddington v.</u>

20
<u>Sarausad</u>, 555 U.S. 179, 190–91 (2009).  In <u>Henderson v. Kibbe</u>, the United States Supreme

21
Court explained that a petitioner challenging the failure to give an instruction faces an "especially

22
heavy" burden.  431 U.S. 145, 155 (1977); <u>see also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th

23
Cir. 1997) (noting that it is the "rare case" in which an improper instruction will justify reversal

24
of a criminal conviction when no objection has been made in the trial court (quoting <u>Henderson</u>,

25
431 U.S. at 154)).  Courts essentially must determine "whether, under the instructions as a whole

26
and given the evidence in the case, the failure to give the [omitted] instruction rendered the trial

27

28
the alibi defense.  This provides a rational tactical reason for not pursuing an aiding theory, negating appellate counsel's claim of ineffective assistance of trial counsel.

1   so fundamentally unfair as to violate federal due process."  Duckett v. Godinez, 67 F.3d 734, 746

2   (9th Cir. 1995) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see Waddington, 555 U.S.

3   at 191 (explaining that a challenged instruction must be evaluated in the context of other

4   instructions and the trial record as a whole, not in artificial isolation (citations omitted)).

5       Even if omission of a particular instruction was constitutionally erroneous, federal habeas

6   relief is not available for such a trial-type error unless the error had a substantial and injurious

7   effect or influence in determining the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619,

8   622–23 (1993) (quotations omitted); see also Hedgpeth v. Pulido, 555 U.S. 57, 61–62 (2008) (per

9   curiam) (applying Brecht prejudice standard to habeas claims of instructional error).

10      **2.  Was the State Court Opinion Contrary to or an Unreasonable Application of
           Clearly Established Federal Law?**

11

12      Assuming that petitioner presents a federal claim here, it lacks merit.  As the Court of

13  Appeal explained, "there was no evidence defendant was present while someone else, or some

14  others, inflicted the fatal stab wounds, nor was there any evidence that defendant was absent, yet

15  somehow contributed to the killing."  Lodged Doc. 21 at 7.  The Court of Appeal also correctly

16  pointed out that "[e]ven if the victim thought more than one Mexican had killed him, this aider

17  theory hinges on speculation that defendant acted solely as part of a group, disregarding trial

18  evidence about the manner of the killing and the absence of a group."  Lodged Doc. 21 at 7–8.  In

19  other words, there is no evidence that someone other than petitioner committed the crime, which

20  is a necessary predicate for the aiding and abetting jury instruction.[8]  It follows that the trial court

21  did not err or violate due process in excluding that instruction.

22      Moreover, a presumption of correctness applies to the California Court of Appeal's

23  finding that the evidence did not support giving the aiding and abetting jury instruction.  See

24  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (state trial court's finding that

25  evidence did not support an instruction is entitled to presumption of correctness).  Petitioner has

26

27

28

---

[8] CALCRIM No. 401 provides: "Aiding and Abetting: Intended Crimes [¶] To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

1  not rebutted this presumption.  To the contrary, the record supports that there was no evidence

2  presented at trial to support such a jury instruction.  Petitioner's argument that the prosecutor

3  argued this theory does not change this analysis.  The prosecutor presented no evidence

4  supporting this theory and in fact made clear in the record, including when addressing a post-trial

5  motion, that "at no point did the people argue aiding and abetting.  We were very clear that the

6  basis of the evidence against Mr. Medina really is the admissions and adopted admissions that he

7  had stabbed the victim."  RT at 2849–66.  See Hopper v. Evans, 456 U.S. 605, 611 (1982)

8  (explaining that due process requires that an instruction "be given *only* when the evidence

9  warrants such an instruction").  Thus, "there was no error and . . . [petitioner's] due process rights

10  were not violated."  Menendez, 422 F.3d at 1029.

11      **III.**    **Claim 3: Petitioner's Due Process Rights Were Violated Because the Trial Court
12  Failed to Instruct on Voluntary and Involuntary Manslaughter**

13         Petitioner attached his California Supreme Court habeas corpus petition, which set forth

14  his arguments regarding this claim.  Petitioner argues that "[t]he prosecutor consistently portrayed

15  petitioner as the actual killer.  However, the jury found not true the allegation petitioner used a

16  knife during the commission of the murder."  (ECF No. 1 at 58.)  Petitioner summarizes his

17  defense as follows:

18            The defense argument was that petitioner "had nothing to do with"
19  the murder, pointing out no physical evidence (DNA, footprints,
          fingerprints, knife, etc.) tied him to it.  The defense argued that the
20  People's case rested on the testimony of Weil and Brewer, who were
          unreliable, inconsistent, and "under the influence" when they
          purported to see the things they testified about.  The defense argued
21  the victim's dying declaration was exculpatory, because the victim
          said "Mexicans" did this to him, and did not name petitioner, whom
22  he knew, and went to pick up.

23  (Id.)  Petitioner acknowledges that the prosecutor and defense counsel represented to the court

24  that neither party was asking for jury instruction on manslaughter.  (Id. at 59.)  Despite this,

25  petitioner argues that "the court has a sua sponte duty to instruct on the elements and theories

26  supported by the evidence and the court failed to instruct on voluntary manslaughter."  (Id. at 60.)

27  Petitioner avers that the "prosecution provided substantial evidence that petitioner aided and

28  abetted the stabber by Stopplemore's last words."  (Id. at 60.)  In that regard, petitioner further

1    argues that not giving the jury instruction prevented him "from arguing that he had no knowledge

2    that the perpetrator planned to kill and he did not intend that Stopplemore be killed." (Id. at 61.)

3        **A.  Decision of the State Court**

4        In the only reasoned state court decision, the Superior Court of California considered this

5    issue and held as follows:

6            The vague, unsupported, and conclusory allegations contained in the
             Petition are insufficient to allow for intelligent consideration of the
7            issues which Petitioner has attempted to raise.  (In re: Swain (1949)
             34 Cal. 2d 300, 303-04; In re:  Patton (1918) 178 Cal. 629).
8

9            The petition is denied because it asserts claims that were raised, or
             could have been raised, on appeal.  Petitioner has failed to establish
             an exception to the rule barring reconsideration of such claims (In re:
10           Harris (1993) 5 Cal.4th 813, 825-26; In re: Waltreus (1965) 62 Cal.2d
             218, 225; In re: Dixon (1953) 41 Cal 2d 756, 759). — as to grounds
11           1 + 2 [for the trial court's failure to instruct the jury sua sponte on
             voluntary and involuntary manslaughter and ineffective assistance of
12           counsel].

13           Petitioner has alleged claims of ineffective assistance of counsel, but
             has failed to state the prejudice Petitioner alleges resulted from this
14           alleged ineffective assistance of counsel.  Prejudice is defined as a
             "reasonable probability that a more favorable outcome would have
15           resulted" (In re: Cox (2003) 30 Cal.4th 974, 1020-21).

16   Lodged Doc. 25.

17       **B.  Analysis**

18           **1.  Legal Standard**

19       When a trial court's omission of a jury instruction is at issue, the habeas petitioner has an

20   "especially heavy" burden to establish a due process violation.  Henderson, 431 U.S. at 155;

21   Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (citations omitted).  As explained above,

22   courts essentially must determine "whether, under the instructions as a whole and given the

23   evidence in the case, the failure to give the [omitted] instruction rendered the trial so

24   fundamentally unfair as to violate federal due process." Duckett, 67 F.3d at 746 (citing Cupp,

25   414 U.S. at 147); see generally Waddington, 555 U.S. at 191 (explaining that a challenged

26   instruction must be evaluated in the context of other instructions and the trial record as a whole,

27   not in artificial isolation (citations omitted)).  Rarely will such a state court instructional error rise

28   to the level of a due process violation.  See Estelle, 502 U.S. at 72–73 (defining "very narrowly"

17

1   category of instructional errors that may violate due process (citation omitted)).

2        **2.   Was the State Court Opinion Contrary to or an Unreasonable Application of**
    **Clearly Established Federal Law?**

3

4       During the trial court's review of jury instructions with counsel, the court specifically

5   inquired whether the prosecution would make a request for an instruction for either voluntary or

6   involuntary manslaughter:

7             THE COURT:  All right.  the Court will -- well, I will instruct and
              also allow verdict forms for both first- and second-degree murder.

8

9             I guess, just so we have a complete record, is there any request for
              anything lesser than that, to wit, either voluntary or involuntary
              manslaughter from the People's standpoint?

10

11            [Prosecution]:  No, Your Honor.  I don't think the evidence in this
              case supports that.  Obviously, if [petitioner] testifies and alleges
              some form of imperfect self-defense, that may alter the position of

12            the case.  But at this point, I think that's exceedingly unlikely.

13            THE COURT:  [Defense counsel]?

14            [Defense counsel]:  I would object to that, Your Honor.

15            THE COURT:  You object to --

16            [Defense counsel]:  Instructing on --

17            THE COURT:  Manslaughter?

18            [Defense counsel]:  We're not asking for that.

19            THE COURT:  The Court, as the record is right now, will not be
              instructing on manslaughter.  Unless something changes, the Court

20            is satisfied with the proposed verdict forms.

21  RT at 2618–19.

22      Here, the California Superior Court was correct in finding that petitioner's vague,

23  unsupported, and conclusory allegations are insufficient.  Petitioner proffered no showing that

24  there was a reasonable probability that the jury would have reached a more favorable verdict if

25  the manslaughter instruction had been given.  Nor can he, considering there was no evidence set

26  forth by either party supporting a finding that petitioner committed manslaughter.

27      Similarly, petitioner did not point to any theory that he or the prosecutor presented at trial

28  that would have supported giving a manslaughter jury instruction.  Such a theory would have in

1  fact been wholly inconsistent with petitioner's defense, that he was in San Francisco with his

2  newborn daughter on the date of the murder.  Petitioner therefore cannot meet his burden of

3  showing that his due process rights were violated by the trial court's failure to instruct the jury

4  sua sponte with a voluntary manslaughter instruction.  Hopper, 456 U.S. at 611 (stating that, in a

5  capital case, "due process requires that a lesser included offense instruction be given *only* when

6  the evidence warrants such an instruction"); Solis v. Garcia, 219 F.3d 922, 929–30 (9th Cir. 2000)

7  (rejecting habeas claim challenging the trial court's failure to instruct on voluntary manslaughter

8  based on heat of passion in part where the record did not support the instruction).

9        Accordingly, not giving a manslaughter instruction was appropriate and the trial court did

10  not err in failing to give such an instruction sua sponte.

11     **IV.     Claim 4: Petitioner Received Ineffective Assistance of Trial and Appellate**
            **Counsel**

12

13        Petitioner argues that his trial and appellate counsel made a number of errors in their

14  representation.  First, he claims trial counsel failed to correctly prepare for an instructional

15  scheme and defense under the lesser included offense of voluntary and involuntary manslaughter,

16  and further not correctly objecting on this subject matter later.  Next, petitioner argues that trial

17  counsel failed to object to the constitutionally erroneous instruction defining implied malice,

18  including those points and arguments he has raised below.  ECF No. 1 at 66–67.

19        Petitioner also argues that appellate counsel was ineffective for not presenting a claim of

20  insufficient evidence to support the second-degree murder conviction in violation of due process.

21  Id. at 72.  In that regard, petitioner vaguely argues: "Petitioner does not agree that appellate

22  counsel was effective by omitting meritorious claims such as (1) the trial [court's] failure to

23  instruct sua sponte on the lesser included offense of voluntary and involuntary manslaughter

24  violating Petitioner's right to due process, a jury trial, and a right to present a defense; (2) the trial

25  court instructed the jury contrary to the clear and unequivocal terms of a criminal statute defining

26  implied malice, thereby violating due process, fundamental fairness, enlarging a criminal statute,

27  and separation of powers rule.  Any one of which would obviously implicate the others;

28  ////

1   (3) Ineffective assistance of trial counsel; and (4) insufficient evidence to support the second

2   degree murder conviction."  ECF No. 1 at 73–74.

3        **A.  Decision of the State Court**

4        In the only reasoned state court decision, the Superior Court of California County of Butte

5   denied the petition for the following reasons:

6        The vague, unsupported, and conclusory allegations contained in the
     Petition are insufficient to allow for intelligent consideration of the
7        issues which Petitioner has attempted to raise.  (In re: Swain (1949)
     34 Cal. 2d 300, 303-04; In re:  Patton (1918) 178 Cal. 629).
8

9        The petition is denied because it asserts claims that were raised, or
     could have been raised, on appeal.  Petitioner has failed to establish
10       an exception to the rule barring reconsideration of such claims (In re:
     Harris (1993) 5 Cal.4th 813, 825-26; In re: Waltreus (1965) 62 Cal.2d
11       218, 225; In re: Dixon (1953) 41 Cal 2d 756, 759). — as to grounds
     1 + 2 [for the trial court's failure to instruct the jury sua sponte on
12       voluntary and involuntary manslaughter and ineffective assistance of
     counsel].

13       Petitioner has alleged claims of ineffective assistance of counsel, but
     has failed to state the prejudice Petitioner alleges resulted from this
14       alleged ineffective assistance of counsel.  Prejudice is defined as a
     "reasonable probability that a more favorable outcome would have
15       resulted" (In re: Cox (2003) 30 Cal.4th 974, 1020-21).

16  Lodged Doc. 25.

17       **B.   Analysis**

18         **1.  Legal Standard**

19       To establish a constitutional violation based on ineffective assistance of counsel, a

20  petitioner must show (1) that counsel's representation fell below an objective standard of

21  reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

22  Washington, 466 U.S. 668, 688, 692 (1984).  Prejudice means that the error actually had an

23  adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

24  errors, the result of the proceeding would have been different.  Id. at 694.  The court need not

25  address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

26  prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

27  sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

28  ///

1

 **2.   Was the State Court Opinion Contrary to or an Unreasonable Application of**
 **Clearly Established Federal Law?**

2

3        The state court concluded that plaintiff's ineffective assistance of counsel claims failed

4   due to lack of prejudice under In re Cox, 30 Cal. 4th 974, 1020–21 (2003), which in turn cites

5   Strickland, 466 U.S. at 697.  The undersigned agrees that petitioner failed to establish any

6   prejudice.  Prejudice is not presumed, and petitioner has the burden of demonstrating the

7   probability of a different outcome had trial and appellate counsel actually performed as petitioner

8   indicates they should have.  See Strickland, 466 U.S. at 689 (explaining that there is a "strong

9   presumption that counsel's conduct falls within the wide range of reasonable professional

10  assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances,

11  the challenged action 'might be considered sound trial strategy'" (citing Michel v. Louisiana, 350

12  U.S. 91, 100 (1955))); United States v. Cronic, 466 U.S. 648, 659–60 (1984) (explaining that

13  prejudice is only presumed when "counsel entirely fails to subject the prosecution's case to

14  meaningful adversarial testing").  Notwithstanding his conclusions, petitioner did not demonstrate

15  the possibility of a different outcome had either trial and/or appellate counsel performed

16  differently.

17       Based on the deferential AEDPA standard applied by this court, the undersigned finds that

18  the state court's rejection of all of petitioner's ineffective assistance of counsel claims was neither

19  contrary to nor an unreasonable application of clearly established federal law.

20  **V.      Certificate of Appealability**

21       The federal rules require a district court that issues an order denying a habeas petition to

22  either grant or deny a certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

23       A judge will grant a certificate of appealability "only if the applicant has made a

24  substantial showing of the denial of a constitutional right," and the certificate must indicate which

25  issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the

26  constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

27  [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment

28  of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

1   As discussed above, this court finds that petitioner has not made "a substantial showing of the

2   denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Moreover, petitioner has not

3   demonstrated that "reasonable jurists would find the district court's assessment of the

4   constitutional claims debatable or wrong."  Slack, 529 U.S. at 484.  Therefore, the court will

5   recommend declining to issue a certificate of appealability.

6                                              **CONCLUSION**

7           For the foregoing reasons, the Clerk of the Court IS HEREBY ORDERED to randomly

8   assign a district judge to this case.

9           For all the reasons explained above, the state courts' denial of petitioner's claims was not

10  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to

11  AEDPA standards, petitioner has not established any violation of his constitutional rights.

12  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

13  denied.  It is FURTHER RECOMMENDED that a certificate of appealability, see 28 U.S.C.

14  § 2253(c), be DENIED.

15          These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

20  he shall also address whether a certificate of appealability should issue and, if so, why and as to

21  which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

22  within fourteen days after service of the objections.  The parties are advised that failure to file

23  objections within the specified time may waive the right to appeal the District Court's order.

24  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25  Dated:  April 21, 2020

26

27  DLB:12(md)
    DB/prisoner-habeas/medina2859.fr

28

                                                          _____
                                                          DEBORAH BARNES
                                                          UNITED STATES MAGISTRATE JUDGE
                                                          22